E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
KEDAR S. BHATIA (Cal. Bar No. Pending)
Assistant United States Attorney
General Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4442
     E-mail:   kedar.bhatia@usdoj.gov

Attorneys for Plaintiff-Respondent
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Nos. 2:05-cr-855-CAS |
| | 2:23-cv-9185-CAS |
| Plaintiff-Respondent, | |
| v. | GOVERNMENT'S OPPOSITION TO DEFENDANT'S PETITION FOR WRIT OF ERROR CORAM NOBIS; DECLARATION OF KEDAR S. BHATIA; EXHIBITS A-K. |
| EDMOND GYULAMDZHYAN, | |
| Defendant-Petitioner. | |

     Plaintiff-Respondent United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Kedar S. Bhatia, hereby opposes the petition for a writ of error coram nobis, Dkt. 29, filed by Defendant-Respondent Edmond Gyulamdzhyan ("defendant").

     This Opposition is based upon the attached Memorandum of Points and Authorities, the Presentence Investigation Report, the files and records in this case, and such further evidence and argument as the Court may permit. The United States respectfully requests the

///

opportunity to supplement its position or otherwise respond to
defendant as may become necessary.


    DATED: February 13, 2024        E. MARTIN ESTRADA
                                    United States Attorney

                                    MACK E. JENKINS
                                    Assistant United States Attorney
                                    Chief, Criminal Division

                                     /s/
                                    _____
                                    KEDAR S. BHATIA
                                    Assistant United States Attorney

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

1

**TABLE OF CONTENTS**

2

3  TABLE OF AUTHORITIES..................................................ii

4  MEMORANDUM OF POINTS AND AUTHORITIES..................................1

5  I.   INTRODUCTION.....................................................1

6  II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY.......................2

7       A.   Offense Conduct...........................................2

8       B.   Criminal History..........................................3

9       C.   Indictment and Plea.......................................3

10      D.   Sentencing................................................5

11      E.   Court Transcripts.........................................7

12  III. APPLICABLE LAW..................................................8

13      A.   Writ of Error Coram Nobis.................................8

14      B.   Ineffective Assistance of Counsel.........................9

15  IV.  DEFENDANT'S CORAM NOBIS PETITION SHOULD BE DENIED...............9

16      A.   Defendant Does Not Show Error Of The Most Fundamental
             Character...............................................10
17
             1.   Defendant Offers Only Implausible Assertions
18                About Defective Performance That Are Inconsistent
                  With the Available Evidence........................10
19
             2.   Defendant Fails to Show Prejudice..................15
20
        B.   Defendant Does Not Show Valid Reasons For Not
21           Attacking His Conviction Earlier........................20

22      C.   Defendant's Claim Is Barred By Laches...................27

23      D.   Defendant Is Not Entitled To An Evidentiary Hearing.....29

24  V.   CONCLUSION.....................................................31

25

26

27

28

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Aghamalian v. United States*,
  781 Fed. App'x 576 (9th Cir. 2019) ........................... 24

4

*Blackledge v. Allison*,
5   431 U.S. 63 (1977) ........................................... 10

6

*Cuppett v. Duckworth*,
  8 F.3d 1132-40 (7th Cir. 1993) .............................. 29

7

*Gonzalez v. United States*,
8   981 F.3d 845 (11th Cir. 2020) ........................... 22, 25

9

*Harrington v. Richter*,
  562 U.S. 86 (2011) ........................................... 15

10

*Hirabayashi v. United States*,
11   828 F.2d 591 (9th Cir. 1987) ................................ 24

12

*Maghe v. United States*,
  710 F.2d 503 (9th Cir. 1983) ............... 20-21, 21, 22, 25, 26

13

*Martinez v. United States*,
14   17 F. App'x 517 (9th Cir. 2001) .......................... 25-26

15

*Martinez v. United States*,
  90 F. Supp. 2d 1072 (D. Haw. 2000) ...................... 21, 25

16

*Matus-Leva v. United States*,
17   287 F.3d 758 (9th Cir. 2002) ................................. 8

18

*Ragbir v. United States*,
  950 F.3d 54 (3d Cir. 2020) .............................. 21, 25

19

*Robleto-Pastora v. Holder*,
20   591 F.3d 1051 (9th Cir. 2010) ............................... 23

21

*Rodriguez-Lugo v. United States*,
  458 F. App'x 688 (9th Cir. 2011) ........................... 28

22

*Shah v. United States,*
23   878 F.2d 1156 (9th Cir. 1989) ............................... 29

24

*Sittman v. United States*,
  No. CR 91-00921-ACK, 2020 WL 109784
25   (D. Haw. Jan. 8, 2020) ..................................... 24

26

*Strickland v. Washington*,
  466 U.S. 668 (1994) ................................ 14, 15, 9

27

*Telink, Inc. v. United States,*
28   24 F.3d 42, 45 (9th Cir. 1994) .............................. 28

ii

*United States v. Darnell*,
 716 F.2d 479 (7th Cir. 1983) ................................. 28

*United States v. Denedo*,
 556 U.S. 904 (2009) ......................................... 8

*United States v. Garcia*,
 No. 99-cr-699-RSWL, 2017 WL 3669542
 (C.D. Cal. Aug. 24, 2017) .................... 14, 26-27, 29, 30

*United States v. Hakim*,
 No. 21-55617, 2022 WL 4103629 (9th Cir. 2001) ................. 26

*United States v. Ifenatuora*,
 586 F. App'x 303 (9th Cir. 2014) ............................. 9

*United States v. Indelicato*,
 No. CR-85-0078-EMC, 2015 WL 5138565
 (N.D. Cal. Sept. 1, 2015) ........................... 24, 27, 30

*United States v. Kroytor*,
 977 F.3d 957 (9th Cir. 2020) ..................... 21, 22, 24, 25

*United States v. Kwan*,
 407 F.3d 1005 (9th Cir. 2005) ..................... 21, 24, 26, 8

*United States v. Laverdure*,
 814 Fed. App'x 236 (9th Cir. 2020) ................... 10, 11, 12

*United States v. Lee*,
 582 U.S. 357 (2017) ..................................... 15, 16

*United States v. Monreal*,
 301 F.3d 1127 (9th Cir. 2002) ................................ 8

*United States v. Njai*,
 312 Fed. App'x 953 (9th Cir. 2009) ........................... 24

*United States v. Reyes*,
 No. CR 06-0463-JCC, 2021 WL 197151
 (W.D. Wash. Jan. 20, 2021) ................................... 24

*United States v. Riedl*,
 496 F.3d 1003 (9th Cir. 2007) ......................... 27, 28, 8

*United States v. Rodriguez*,
 49 F.4th 1025 (9th Cir. 2022) ..................... 16, 17, 18

*United States v. Rodriguez-Vega*,
 797 F.3d 781 (9th Cir. 2015) ..................... 12, 13, 15, 20

*United States v. Taylor*,
 648 F.2d 565 (9th Cir. 1981) ................................. 21

*United States v. Zhu*,
   No. 03-cr-348-WHA, 2016 WL 729525
   (N.D. Cal. Feb. 24, 2016) .................................. 27, 30

**Statutes**

8 U.S.C. § 1159 ......................................... 22, 23

18 U.S.C. § 1029 ...................................... 3, 4, 5, 6, 7

California Penal Code § 12025 ..................................... 3

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3        In 2006, defendant pleaded guilty to one felony count arising

4 out of his role in a fraud scheme. In 2023, seventeen years later,

5 defendant filed the instant Petition for Writ of Error Coram Nobis.

6 Dkt.[1] 29 (the "Petition"). In the Petition, defendant claims that his

7 trial counsel misadvised him about the immigration consequences of

8 his conviction and misadvised him about how the conviction would

9 affect his dream of becoming a commercial airline pilot.

10       Because of defendant's delay in bring his claim, critical

11 evidence bearing on his claim is lost forever. His trial counsel is

12 now deceased, and the transcripts from his change-of-plea proceeding

13 and sentencing proceeding are inaccessible. The available evidence,

14 however, contradicts defendant's allegations and renders his claims

15 entirely implausible. Defendant's coram nobis claim should be denied

16 for three independent reasons: (1) he fails to show that his trial

17 counsel was defective; (2) he fails to show prejudice; and (3) he

18 fails to show valid reasons for not attacking his 17-year-old

19 conviction earlier. Furthermore, his claim is barred by the doctrine

20 of laches.

21       For each of these independent reasons, the Petition should be

22 denied. The Petition should also be denied without an evidentiary

23 hearing.

24

25

26

27

---

28 [1] "Dkt." refers to the criminal docket in United States v.
Gyulamdzhyan, No. 05-cr-855-CAS.

1

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.   Offense Conduct

In 2004 and 2005, defendant was employed at a toy shop in Universal City, California (the "Toy Shop"). Presentence Investigation Report, dated April 3, 2006 ("PSR") at ¶ 10. His duties at the Toy Shop included ringing up transactions on a cash register and handling credit cards that customers used to make purchases. Id.

From approximately February 2004 to March 2005, defendant exploited his role at the Toy Shop to skim unsuspecting customers' credit cards, stealing their credit card information. Id. ¶¶ 10-13. While he was working at the store, he took credit cards handed to him by real customers and "skimmed" them, copying credit card numbers and other data stored on the magnetic strips of the credit cards. Id. ¶ 10. Defendant skimmed approximately 15 cards every two to three weeks. Id. ¶ 11. Defendant sold the credit card information to a co-conspirator who showed him how to use the skimming device and paid him $15 for each credit card number he stole. Id. ¶ 11. After defendant sold the credit card information, a co-conspirator used the credit card numbers to buy items from various merchants; however, those purchases were later the subject of charge-backs, resulting in losses to the merchants. See id. ¶ 13.

On March 25, 2005, Special Agents with the United States Secret Service traveled to the Toy Shop and attempted to speak with defendant. Id. ¶ 12. When defendant saw the Special Agents, he attempted to discard the skimmer by removing it from his pocket and dropping it into an empty box. Id. When agents later analyzed the skimmer, it contained the credit cards numbers and data belonging to

twelve different credit cards, all of which had been used legitimately at the Toy Shop. Id.

In total, between approximately March 2004 and March 2005, eighty-six credit card numbers were legitimately used at the Toy Shop before they were compromised, resulting in an actual loss of $102,600.12. Id. ¶ 13; see also Plea Agreement, dated February 8, 2006, Dkt. 17 (Bhatia Decl., Exh. B) ("Plea Agreement") at ¶ 8. There were more than a hundred individuals who had their credit card information stolen by defendant, and four credit card issuers and four merchants who sustained actual losses. PSR ¶ 13; see Gov't Sent'g Submission at 7; Deft Sent'g Submission at 3.

**B.   Criminal History**

Prior to committing the fraud offense for which he was convicted, defendant was convicted for carrying a concealed weapon in a vehicle, in violation of California Penal Code § 12025(a)(1). Id. ¶¶ 41-44. He was convicted after Los Angeles Police Department officers searched his vehicle and found a 38-caliber revolver inside. Id. ¶ 43. Before searching defendant's vehicle, officers observed defendant standing with a group of four other individuals; inside a nearby vehicle was a second firearm, a semi-automatic handgun. Id.

For this crime, on January 13, 2004, defendant was sentenced to 24 months' probation. Id. ¶ 41. He began the card skimming fraud scheme just a month after being sentenced for his unlawful possession of a firearm, and he committed the fraud scheme while serving his term of probation from that conviction. Id. ¶¶ 13, 41.

**C.   Indictment and Plea**

On August 30, 2005, the grand jury returned an indictment charging defendant in two counts. Dkt. 1 (Bhatia Decl., Exh. A)

3

("Indictment"). Count One charged defendant with trafficking in unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(2), and Count Two charged defendant with possessing device-making equipment, in violation of 18 U.S.C. § 1029(a)(4). After three adjournments, trial was scheduled for February 21, 2006. Dkts. 10, 14, 15, 16.

On the eve of trial, on February 10, 2006, pursuant to the Plea Agreement, defendant pleaded guilty to Count One in the Indictment. See Dkt. 18 (Bhatia Decl., Exh. C) ("Plea Minutes"); Plea Agreement ¶ 1. In the Plea Agreement, defendant acknowledged that he could face "unanticipated collateral consequences" from his guilty plea:

> Defendant further understands that the conviction in this case may subject defendant to various collateral consequences, including but not limited to, <u>deportation</u>, revocation of probation, parole, or supervised release in another case, <u>and suspension or revocation of a professional license</u>. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

Plea Agreement ¶ 7 (emphasis added).

In signing the agreement, defendant certified that "I have read this agreement and carefully discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. My attorney has advised me of my rights, of possible defenses, of the Sentencing Guideline provisions, and of the consequences of entering into this agreement." Id. at 12. Defendant's defense lawyer at the time ("defense counsel") certified that "I have carefully discussed every part of this agreement with my client. Further, I have fully advised my client of his/her rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this agreement. To my knowledge, my

4

client's decision to enter into this agreement is an informed and voluntary one." Id. at 13.

Nevertheless, defendant agreed to plead guilty and "admitted that [he] is, in fact, guilty of this offense as described in count one of the indictment." Id. ¶ 2.

At the change-of-plea proceeding, the Court "question[ed] the defendant regarding his intention to enter a plea of guilty and advise[d] the defendant of his Constitutional Rights." Plea Minutes at 1. The Court accepted defendant's guilty plea, "find[ing] the plea to be knowledgeable and voluntary." Id.

**D. Sentencing**

After defendant pleaded guilty, the Probation Office prepared the Presentence Investigation Report. In the PSR, dated April 3, 2006, the Probation Office noted defendant's immigration status:

> Gyulamdzhyan indicated that he applied for permanent legal residence. Approximately two to three years ago, he received a notice that he would receive his alien registration card soon; however, despite repeatedly contacting ICE, he has not received his card.

> The Bureau of Immigration and Customs Enforcement (ICE) has verified that the defendant is residing legally within the United States with an application pending, and does not indicate whether he is a legal permanent resident. The defendant's Alien Registration Number (ARN) is A 77432518. He entered the United States in 2000.

PSR ¶¶ 62-63.

On May 8, 2006, the Probation Office submitted a letter to the Court with its recommendation for sentencing and an explanation of that recommendation (the "Probation Recommendation Letter"). In the Probation Recommendation Letter, the Probation Office noted as a mitigating factor that defendant may have "jeopardized his ability to permanently establish himself in the United States":

5

> The defendant is a legal alien residing in the United States and has a pending application for permanent legal residency in the United States. In his commission of the offense, he may have jeopardized his ability to permanently establish himself in the United States and may be subject to deportation, thereby becoming separated from his immediately family.

Probation Recommendation Letter at 4. The Probation Office ultimately recommended a below-Guidelines sentence of probation, with a term of home confinement and, among other things, a condition that would require defendant to comply with immigration rules and regulations, "given Gyulamdzhyan's alien status in the United States and his pending legal permanent residency application." Id. at 4-5.

The Probation Recommendation Letter was sent to the parties and referenced by both parties in their sentencing positions. See Defendant's Sentencing Position, Dkt. 19 (Bhatia Decl., Exh. D) ("Def't Sentencing Position") at 1; Government's Sentencing Position, Dkt. 20 (Bhatia Decl., Exh. E) ("Gov't Sentencing Position") at 3, 5-6. In the government's sentencing position, the government discussed potential immigration consequences, noting that "the Probation Officer's letter identifies a number of factors that the Probation Officer views as mitigating, such as . . . [defendant's] potential for deportation . . . ." Gov't Sentencing Position at 5.

On July 19, 2006, the Court sentenced defendant to five years' probation. Dkt. 26 (Bhatia Decl., Exh. G) ("Sentencing Minutes") at 2; Dkt. 27 (Bhatia Decl., Exh. H) ("Judgment") at 1. Among other special conditions of probation, the Court ordered that "defendant shall comply with the immigration rules and regulations of the United States, and if deported from this country, either voluntarily or

involuntarily, not reenter the United States illegally." Judgment at 2.

Defendant's term of supervision terminated on July 18, 2011. Bhatia Decl., Exh. I ("Probation Termination Letter") at 1. As of January 23, 2024, defendant has paid approximately $16,183 towards his restitution judgment of $105,690. See Bhatia Decl., Exhs. J-K (restitution payment records).

### E.   Court Transcripts

As set forth in the accompanying declaration, the government has undertaken several steps to obtain the transcripts from defendant's plea proceeding on February 10, 2006, and his sentencing proceeding on July 19, 2006. Bhatia Decl. ¶¶ 2-5. The government requested and received records from U.S. Department of Justice archives; requested and received records from the District Court's records department; and directly contacted the two court reporters who were present for the proceedings. Id.

Ultimately, none of these efforts were successful in producing the plea or sentencing transcripts. Neither U.S. Department of Justice archive nor the District Court Record Department had the transcripts. Id. ¶ 4. The court reporter present for the plea proceeding stated that she was unable to access the relevant electronic records and believed the media files were corrupted given their age. Id. ¶ 5. Defendant's current counsel was also unable to obtain the plea transcript. See Declaration of Nareg Gourjian ¶¶ 2-6 (describing other unsuccessful efforts to obtain the plea transcript from the court reporter). The court reporter present for the sentencing proceeding stated that she no longer had records going

back to 2006, when the sentencing proceeding was held. Bhatia Decl. ¶ 5.

**III. APPLICABLE LAW**

    **A.   Writ of Error Coram Nobis**

    A defendant who has fully served his sentence may seek the extraordinary writ of coram nobis from the district court that sentenced him. United States v. Kwan, 407 F.3d 1005, 1011-12 (9th Cir. 2005); United States v. Monreal, 301 F.3d 1127, 1131-32 (9th Cir. 2002). The writ of error coram nobis is a "highly unusual remedy, available only to correct grave injustices in a narrow range of cases where no more conventional remedy is applicable." United States v. Riedl, 496 F.3d 1003, 1005 (9th Cir. 2007); see also Matus-Leva v. United States, 287 F.3d 758, 760 (9th Cir. 2002). Courts are careful to "confine" use of the writ "so that finality is not at risk in a great number of cases." United States v. Denedo, 556 U.S. 904, 911 (2009) (internal quotation marks omitted).

    The burden is on the petitioner to show that he meets each of the following four conditions for coram nobis relief:

    (1) a more usual remedy is not available;

    (2) valid reasons exist for not attacking the conviction earlier;

    (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and

    (4) the error is of the most fundamental character.

Riedl, 496 F.3d at 1006 (quoting Hirabayashi v. United States, 828 F.2d 591, 604 (9th Cir. 1987)). Failure to meet any one of these requirements is "fatal" to the petition. Matus-Leva, 287 F.3d at 760.

8

## B.   Ineffective Assistance of Counsel

Where, as here, a defendant seeks a writ of error coram nobis on the basis of deficient performance by counsel, the defendant must satisfy the familiar standard from Strickland v. Washington, 466 U.S. 668 (1994). See United States v. Ifenatuora, 586 F. App'x 303 (9th Cir. 2014). To show ineffective assistance of counsel, the defendant must demonstrate that his then-attorney's representation "fell below an objective standard of reasonableness," and that he suffered prejudice as a result. Strickland, 466 U.S. at 694.

In assessing reasonableness, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." Strickland, 466 U.S. at 689. Accordingly, "[j]udicial scrutiny of counsel's performance must be highly deferential" and "every effort" must "be made to eliminate the distorting effects of hindsight." Id.

## IV.  DEFENDANT'S CORAM NOBIS PETITION SHOULD BE DENIED

Defendant's coram nobis claim should be denied for three independent reasons: (1) he fails to show that his trial counsel was defective; (2) he fails to show prejudice; and (3) he fails to show valid reasons for not attacking his 17-year-old conviction earlier. Furthermore, his claim is barred by the doctrine of laches. For each of these independent reasons, his petition should be denied.[2]

---

[2] The government agrees that defendant has shown that a more usual remedy is not available (the first element of a coram nobis claim) and, taking defendant's allegations as true, that a case or controversy exists (the third element of a coram nobis claim).

**A.    Defendant Does Not Show Error Of The Most Fundamental Character**

     1.    <u>Defendant Offers Only Implausible Assertions About Defective Performance That Are Inconsistent With the Available Evidence</u>

Defendant's allegation that he was affirmatively misadvised by his counsel is implausible and is contradicted by the available evidence. In light of the contradictory evidence, defendant's conclusory, self-serving allegations are insufficient to meet his burden of proof. Accordingly, he fails to show that his counsel was defective and he fails to error of the most fundamental character. For this reason, his coram nobis claim should be denied.

The Supreme Court has instructed that "the representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." <u>Blackledge v. Allison</u>, 431 U.S. 63, 74 (1977). Because "[s]olemn declarations in open court carry a strong presumption of verity," defendants new "presentation of conclusory allegations" that are "unsupported by specifics" should be "subject to summary dismissal," as should "contentions that in the face of the record are wholly incredible." <u>Id.</u> A district court need not accept a defendant's "bare bones" claim of constitutional error, <u>United States v. Laverdure</u>, 814 Fed. App'x 236, 239 (9th Cir. 2020) (Section 2255 claim), and has discretion to deny an implausible claim without holding an evidentiary hearing. <u>See generally</u> <u>infra</u>, Part IV.D.

Defendant's unsubstantiated claim that his lawyer counseled him that a felony conviction would not affect some future naturalization

1   application is both conclusory and incredible. <u>First</u>, defendant

2   offers no details about when or how his lawyer relayed to him the

3   constitutionally defective advice on two topics that contradicted the

4   plain text of the Plea Agreement. Plea Agreement ¶ 7. He simply says

5   that defense counsel "counseled" him incorrectly about immigration

6   consequences and the effect of his conviction on some prospective

7   application for a commercial pilot license. Deft Decl. ¶¶ 18, 21.

8       <u>Second</u>, defendant's factual allegations are implausible and

9   contradicted by the available evidence. The Plea Agreement plainly

10  states that "conviction in this case may subject defendant to various

11  collateral consequences, including but not limited to deportation

12  [and] suspension or revocation of a professional license." Plea

13  Agreement ¶ 7. The Plea Agreement goes even further and makes clear

14  that there may be "<u>unanticipated</u> collateral consequences," which

15  "will not serve as grounds to withdraw defendant's guilty plea. <u>Id.</u>

16  (emphasis added). At the end of the Plea Agreement, defense counsel

17  certified that he "carefully discussed every part of this agreement

18  with [his] client" and "fully advised [his] client of his/her

19  rights . . . and of the consequences of entering into this

20  agreement." Plea Agreement at 13. Defendant certified that he "read

21  this agreement and carefully discussed every part of it with [his]

22  attorney," his attorney "advised" him "of the consequences of

23  entering into this agreement," that "[n]o promises . . . have been

24  made to [him] other than those contained in this agreement," and he

25  "understand[s] the terms of this agreement." <u>Id.</u> at 12.

26      In the face of the plain language of the Plea Agreement,

27  defendant now offers the conclusory statement in his declaration that

28  "Attorney Holmes <u>affirmatively</u> counseled me that my guilty plea would

1   not subject me to <u>any</u> immigration consequences." Deft Decl. ¶ 18; <u>see</u>

2   <u>also</u> <u>id.</u> ¶ 14. Regarding his aspiration of becoming a commercial

3   pilot, defendant states that "Attorney Holmes affirmatively counseled

4   me that my aspiration of becoming a commercial pilot would not be

5   impacted by pleading guilty to credit card skimming as a 20-21-year-

6   old." <u>Id.</u> ¶ 21.

7        While the Plea Agreement's advisal does not alone absolve

8   counsel of the responsibility of providing effective counsel, <u>see</u>

9   <u>United States v. Rodriguez-Vega</u>, 797 F.3d 781, 787 (9th Cir. 2015),

10  the Plea Agreement's clear warnings and certifications by defendant

11  and his counsel cast substantial doubt on defendant's allegation that

12  that he relied on incorrect advice when pleading guilty. Combined

13  with the surrounding circumstances, the facts contradict defendant's

14  self-serving allegations. Defendant offers no explanation for the

15  discrepancy between the clear admonition in the Plea Agreement that a

16  conviction could lead to deportation and his defense counsel's

17  purported misadvice. Nor does defendant explain why he was ignorant

18  of potential immigration consequences despite those potential

19  consequences being explicitly referenced in the PSR, the Probation

20  Recommendation Letter, and the government's sentencing submission as

21  mitigating factors. Indeed, defendant may very well have benefited

22  from the immigration consequences he now claims are prejudicial when

23  the Court sentenced him to only a term of probation, well-below the

24  Guidelines range of 15 to 21 months' imprisonment. PSR ¶ 88.

25       In response to the Plea Agreement's admonition that a conviction

26  could lead to "suspension or revocation of a professional license,"

27  defendant offers only the poor excuse that he thought that language

28  "referred to licenses such as for a doctor or lawyer." Deft Decl.

¶ 21. But if "becoming a pilot was [his] entire life goal," it is simply not believable that he thought a bar on "professional license" meant *only* doctor or lawyer licenses. Id. ¶ 3. It is also not believable that defense counsel, a criminal defense attorney, would offer a definitive opinion on whether a criminal conviction could influence the byzantine regulatory apparatus necessary for defendant to become a commercial airline pilot.

Ultimately, defendant's allegations could only be true if there was an implausible confluence of events:

1.   Defense counsel wrongly believed that conviction for an aggravated felony would not result in "any adverse immigration consequences," Deft Decl. ¶ 18;

2.   Defense counsel wrongly believed that conviction for a federal fraud-based crime "would not . . . impact[]" defendant's aspiration of becoming a commercial pilot, which would have required defense counsel to have some expertise in the complicated federal rules and regulations for commercial pilot licensure, id. ¶ 21;

3.   Defense counsel then affirmatively advised defendant of those wrong beliefs in the black-and-white terms that defendant now asserts, id. ¶¶ 18, 21;

4.   Defendant misunderstood or simply ignored the Plea Agreement's plain warning that his conviction could result in his deportation;

5.   Defendant misunderstood or simply ignored the Plea Agreement's plain warning that his conviction could result in "suspension or revocation of a professional license" or could have "unanticipated collateral consequences," despite his claim that he

1    also harbored the very specific long-standing goal of becoming a

2    licensed commercial pilot;

3        6.   Both defendant and his counsel certified the plea and

4    attested that they had fully discussed "every part" of the Plea

5    Agreement, even though they had not, Plea Agreement at 7, 12-13;

6        7.   None of these misadvisements, misunderstandings, or

7    promises from defense counsel were addressed during the Rule 11 plea

8    colloquy, the transcript of which is no longer available due to

9    defendant's delay in bringing his claim; and,

10       8.   Despite defendant's sophistication with the immigration

11   system, working with immigration lawyers in 2006 and 2013, and a

12   prior application to ameliorate the effects of his aggravated felony

13   conviction, defendant did not learn until February 2023 that his

14   conviction in this case could affect naturalization, Tolchin Decl.

15   ¶ 16.

16       Defendant falls far short of demonstrating that such an

17   implausible sequence of events occurred. "Permitting" a declaration,

18   such as defendant's, "to carry the day" on an ineffective assistance

19   claim "would allow virtually any defendant to retroactively claim

20   that [her] attorney" provided misadvice about the immigration

21   consequences of pleading guilty. United States v. Garcia, No. 99-cr-

22   699-RSWL, 2017 WL 3669542, at *4 (C.D. Cal. Aug. 24, 2017). Such a

23   result is clearly at odds with Strickland's presumption of

24   reasonableness. Strickland, 466 U.S. at 689.

25       This Court should find that defendant has not overcome

26   Strickland's "strong presumption that counsel's conduct f[ell] within

27   the wide range of reasonable professional assistance." Strickland,

28   466 U.S. at 689.

2. <u>Defendant Fails to Show Prejudice</u>

Defendant's coram nobis claim should also be rejected because he fails to show that he was prejudiced by the alleged misadvice.

As with the first prong of the <u>Strickland</u> test, defendant bears the burden of showing prejudice. <u>Strickland</u>, 466 U.S. at 694. "[D]efendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> And "[w]here ineffective assistance leads a petitioner to accept a plea bargain, a different result means that 'but for counsel's errors, [petitioner] would either have gone to trial or received a better plea bargain.'" <u>Rodriguez- Vega</u>, 797 F.3d at 788 (citation omitted). "The likelihood of a different result must be substantial, not just conceivable." <u>Harrington v. Richter</u>, 562 U.S. 86, 112 (2011) (citing <u>Strickland</u>, 466 U.S. at 693).

In <u>United States v. Lee</u>, 582 U.S. 357 (2017), the Supreme Court clarified the standard for establishing prejudice in the context of a guilty plea, "emphasiz[ing]" that the "inquiry . . . demands a 'case-by-case examination' of the 'totality of the evidence.'" <u>Id.</u> at 367 (citations omitted). While there is no "<u>per se</u> rule that a defendant with no viable defense cannot show prejudice from the denial of his right to trial," at the same time "[c]ourts should not upset a plea solely because of post hoc assertions from a defendant about how [s]he would have pleaded but for [her] attorney's deficiencies." <u>Id.</u> at 365, 369. Rather, "[j]udges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." <u>Id.</u> at 369.

For example, in Lee, the Supreme Court cited contemporaneous evidence showing that defendant's concern about immigration consequences and his ties to the United States: Lee repeatedly pressed his attorney for reassurance regarding the risk of deportation; and at the time of his plea, he admitted he did not "understand" when the judge asked him how the possibility of deportation would affect his decision, and he subsequently physically turned to his attorney for advice during the hearing. Id. at 369. Lee's unique personal circumstances also showed his express preference to avoid deportation. At the time of his plea agreement, he had lived in the United States for three decades, owned two businesses, was the only available family member to take care of his aging parents, and had not returned to his country of origin, South Korea, since he left as a child. Id. at 370.

In United States v. Rodriguez, 49 F.4th 1205 (9th Cir. 2022), the Ninth Circuit recently recognized four factors that courts should consider when reviewing "contemporaneous evidence" for evidence of prejudice:

(1) how likely the defendant would be to prevail at trial;

(2) the defendant's relative connections to the United States and to his country of citizenship;

(3) the relative consequences of the defendant's guilty plea compared to a guilty verdict at trial; and

(4) most importantly, any evidence of how important immigration consequences were to the defendant at the time he pleaded guilty. Id. at 1214.

Here, relying on the Rodriguez factors and a review of the contemporaneous evidence, defendant fails to meet his burden of

showing prejudice. <u>First</u>, it is overwhelming unlikely that defendant would have prevailed at trial, which supports the inference that trial or a better plea agreement was not likely with or without the correct immigration advice. Defendant worked at the Toy Shop during the period when there was substantially card-skimming activity, and then law enforcement officers observed him discarding a credit card skimmer when they tried to talk to him. PSR ¶¶ 10, 12. On the discarded credit card skimmer, agents found data belonging to twelve different cards that had been legitimately used at the Toy Shop. <u>Id.</u> ¶ 12. Defendant then spoke to law enforcement officers and admitted to his role in the fraud and advancing the fraud with co-conspirators. <u>Id.</u> ¶ 11; <u>see also</u> Plea Agreement ¶ 8.

Far from going to trial, the sentencing documents show that defendant had weighed cooperating with law enforcement but ultimately declined to do so given a fear of retaliation. PSR ¶ 18; Gov't Sent'g Submission at 4. Given the substantial evidence against him, this factor weighs against him having gone to trial.

<u>Second</u>, defendant's connections to his country of origin – Armenia – were stronger than his connections to the United States, suggesting that the risk of deportation was not as great as he claims now. Defendant lived in Armenia from approximately 1985 to 1993, in Russia from 1993 to 1997, and in Armenia again from 1997 to 2000. <u>Id.</u> ¶¶ 55, 57-58, 63. He lived in the United States from 2000 through the time he committed his fraud in 2004-2005, was arrested in 2005, and was convicted and sentenced in 2006. <u>Id.</u> ¶¶ 58, 63. Although defendant's immediate family was in the United States, he was not married and did not have any children. <u>Id.</u> ¶ 56. At the time of his sentencing, defendant had lived fifteen years in Armenia or Russia

17

and only five years in the United States, nearly half of which was in the criminal justice system for his 2003 arrest for carrying a concealed weapon and then his 2005 arrest in this case. Id. ¶ 41.

In Rodriguez, the Ninth Circuit found that this factor was only "inconclusive" where a defendant a spouse and three U.S.-citizen children in the United States but had a parent and siblings abroad. 49 F.4th at 1214-15. Here, the facts skew far more against defendant, who had only been here for a short period, had been embroiled in the criminal justice system twice in that time, and had no dependents. This factor weighs against a showing of prejudice.

Third, defendant likely benefitted from a guilty plea, as opposed to going to trial. Defendant's Guidelines range was 15-21 months under the terms of the plea agreement, PSR ¶ 88 (total offense level 13 and criminal history category II), and it would have been 24-30 months had he gone to trial and been convicted. U.S.S.G. § 5, Part A (total offense level 16 and criminal history category II). The government submits that defendant would have been more likely to receive a custodial sentence if he had gone to trial and faced the higher Guidelines range. This factor weighs against a showing of prejudice or is, at best, inclusive.[3]

Finally, the contemporaneous evidence does not show that immigration consequences were uniquely important to defendant at the

---

[3] In the Tolchin declaration, Tolchin says she would have advised defendant to plead guilty pursuant to a plea agreement to only some of the criminal conduct he committed, with only a limited loss amount in the plea agreement. See Tolchin Decl. ¶¶ 20-22. However, there is no reason to believe that the government would agree to extend a plea to defendant to any count other than the one to which he already pleaded guilty and there is certainly no reason to believe the government would agree to an artificially low loss amount, in contravention of the general prohibition on fact bargaining in plea agreements.

time of his plea. As set forth above, the Plea Agreement referred to the fact that defendant could be deported due to his conviction, Plea Agreement ¶ 7; the PSR and Probation Recommendation Letter referenced his tenuous immigration situation, PSR ¶ 62, Probation Recommendation Letter at 4; and the Government's sentencing submission noted the "potential for deportation" as a mitigating factor, Gov't Sent'g Submission at 5.

In the face of this evidence, defendant provides quite literally no contemporaneous evidence that immigration consequences were the "determinative issue" for him. Lee, 582 U.S. at 371 (internal quotation marks omitted). He offers only bare assertions, nearly twenty years after his plea, that he would have done things differently. Deft Decl. ¶ 20 ("Had I known that this plea would forever bar me from becoming a U.S. citizen, my home for the past 25 years, I would have never agreed to plead guilty but instead would have exercised his [sic] right to a jury trial.").

By contrast, in Lee, the record showed that the defendant immediately raised his concern about immigration consequences during a colloquy with the judge at his change-of-plea proceeding and only agreed to plead guilty when he was told by his counsel that the judge's statement was a "standard warning." 582 U.S. at 369. In Rodriguez, the defendant presented evidence that he had spoken with his defense attorney at least twice about immigration consequences, appeared surprised at his plea proceeding when immigration consequences were raised, and hired an immigration attorney to consult with his defense attorney. 49 F.4th at 1205. In Rodriguez-Vega, there was evidence that defendant "ha[d] numerous conversations with her counsel regarding the immigration consequences of her plea,"

"rejected an initial plea bargain containing a stipulated removal provision, and accepted the revised plea bargain only after this provision had been removed." 797 F.3d at 789. The Supreme Court has made clear that "[c]ourts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." Lee, 582 U.S. at 369. This is necessary because "the strong societal interest in finality has 'special force with respect to convictions based on guilty pleas,'" Id. at 368-69 (quoting United States v. Timmreck, 441 U.S. 780, 784 (1979)).

Here, defendant has puts forward no evidence to corroborate his claim of prejudice and the existing facts show there was no prejudice. Because he simply fails to meet his burden, his coram nobis claim should be denied.

**B.    Defendant Does Not Show Valid Reasons For Not Attacking His Conviction Earlier**

Even if defendant could show ineffective assistance of counsel, he gives no adequate explanation for his 17-year delay in challenging the voluntariness of his conviction. Defendant suggests, albeit indirectly, that he had been trying to overcome the collateral consequences of his conviction for a decade but only recently learned "definitely" that his conviction would bar naturalization. Petition at 21. As set forth below, case law holds that is not an adequate reason for delay, and certainly not delay for 17 years. His failure to provide sound reasons for delay is fatal to his coram nobis claim.

To satisfy the second requirement for coram nobis relief, a defendant must demonstrate to that "there are 'sound reasons' for his failure to seek relief earlier." Maghe v. United States, 710 F.2d

503, 503-04 (9th Cir. 1983) (per curiam) (affirming a district court's denial of a writ of error coram nobis without a hearing because the petitioner "failed to allege an adequate basis justifying his 25-year delay in seeking relief"); United States v. Taylor, 648 F.2d 565, 573 (9th Cir. 1981). Because there is no statutory deadline, "courts have required coram nobis petitioners to provide valid or sound reasons explaining why they did not attack their sentences or convictions earlier." See Kwan, 407 F.3d at 1012; see also Maghe, 710 F.2d at 503-04.

In United States v. Kroytor, 977 F.3d 957 (9th Cir. 2020), the Ninth Circuit made clear that "[o]ur caselaw . . . reflects that whether a petitioner can reasonably raise a claim is determinative of whether delay is justified." Id. at 961. "[A] delay is not justified if the petitioner was aware of a potential ground for relief earlier, but did not choose to pursue it." Martinez v. United States, 90 F. Supp. 2d 1072, 1076 (D. Haw. 2000), aff'd, 17 F. App'x 517 (9th Cir. 2001). For the same reason, "[a] defendant seeking to avoid the collateral consequences of a conviction cannot postpone seeking relief until it appears that a collateral consequence is imminent." Ragbir v. United States, 950 F.3d 54, 63 (3d Cir. 2020).

For example, in Maghe v. United States, 710 F.2d 503 (9th Cir. 1983), the Ninth Circuit affirmed the denial of a coram nobis claim on timeliness grounds where the defendant waited 25-years before challenging his conviction. The defendant in that case challenged his conviction on the basis that it resulted in his undesirable discharge from the armed forces and, twenty-five years later, tried to upgrade his discharge and was denied. Id. at 503-04. The Ninth Circuit noted that the recent denial "explains only [the defendant's] motive for

now seeking relief" but, because he long-ago knew about the reason for his original discharge, he did not adequately "explain the <u>reason</u> that he waited 25 years before seeking to upgrade a discharge that he allegedly knew should be upgraded." <u>Id.</u> at 504. The Ninth Circuit has separately recognized that "where petitioners reasonably could have asserted the basis for their coram nobis petition earlier, they have no valid justification for delaying pursuit of that claim." <u>Kroytor</u>, 977 F.3d at 961; <u>see also</u> <u>Gonzalez v. United States</u>, 981 F.3d 845, 852-54 (11th Cir. 2020) (holding that a defendant began suffering from his defense counsel's purported misadvice about immigration consequences as soon as he was convicted, not simply when removal proceedings began, and could have brought a cognizable collateral claim at the earlier date).

Likewise, in <u>United States v. Golshani</u>, No. 00-cr-7-GAF (C.D. Cal. Nov. 15, 2011), Dkt. 117, the Court denied a coram nobis claim where defendant was allegedly misadvised of immigration consequences and, citing uncertainty in the law, waited for 10 years to bring his claim until the Supreme Court ruled definitely on the issue. The Court held that the legal support for a claim of misadvice existed long before the Supreme Court's decision and the defendant's "contention that he did not feel he could be successful is not a proper ground for failing to act." <u>Id.</u> at 2.

Here, defendant's arguments about timelineness fail because he knew by 2013 about adverse immigration consequences from his felony conviction. It was in 2013 that defendant "was able to obtain permanent resident status through a special discretionary waiver for refugees" despite having sustained an aggravated felony conviction. Tolchin Decl. ¶ 11 (citing 8 U.S.C. § 1159(c)). Defendant obtained a

waiver under 8 U.S.C. § 1159(c), which "provides the Secretary of Homeland Security or the Attorney General with discretion to waive inadmissibility for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest." Robleto-Pastora v. Holder, 591 F.3d 1051, 1058 (9th Cir. 2010) (internal quotation marks omitted) (emphasis added). In defendant's own declaration, he described the 2013 relief as "a waiver which served as a pardon and allowed me to become a permanent resident---but still not a naturalized citizen." Deft Decl. ¶ 8.[4]

Therefore, by 2013 – and presumably earlier, when defendant began working with an immigration attorney and started the process of applying for such a waiver – defendant knew he was facing an immigration hurdle. By that date, he knew that his felony conviction barred permanent resident status subject to a discretionary waiver by the Secretary of Homeland Security or the Attorney General. This immigration jeopardy contradicted defense counsel's purported

---

[4] Other facts in the Petition and declaration corroborate that defendant knew about the consequences from his conviction long ago. First, in 2006, before he was even sentenced, the PSR and Probation Recommendation Letter spoke about how his conviction threatened his immigration status. PSR ¶¶ 62-63; Probation Recommendation Letter at 4. Second, after he became a permanent resident in 2013, he acknowledges that he "look[ed] for a new lawyer" to take over the "costly" matter of preparing his "case to become a naturalized citizen." Deft Decl. ¶ 9. This also supports fact that defendant knew his felony conviction would disadvantage him in the immigration process because he knew that his disadvantaged immigration claim would be "costly." Third, in his Petition, defendant writes that defense counsel's listing on the California bar website as "inactive," as opposed to "deceased," contributed to the delay in bringing the Petition because he "would periodically try to ascertain the whereabouts of his attorney." Petition at 21. The inference from this fact is that defendant was long-ago seeking to contact defense counsel in order to overturn the criminal conviction that he now regrets.

misadvice "that [his] guilty plea would not subject [him] to <u>any</u> adverse immigration consequences." Deft Decl. ¶ 18.

Critically, <u>nowhere</u> in his declaration does defendant say that he learned for the first time in February 2023 that his conviction in this case threatened his prospects of naturalization. Defendant has known the essential facts of his coram nobis claim – that he was misadvised and relied on that misadvice – for more than 10 years and his failure to act is fatal to his claim. Case law requires significantly more urgency than what defendant showed here. <u>Kwan</u>, 407 F.3d at 1013 (defendant "sought the advice of counsel and pursued legal remedies to address the collateral consequences of his conviction during the period of delay"); <u>Hirabayashi</u>, 828 F.2d at 605 ("district court's decision to grant the writ was clearly based upon material which was not known until very recently," including "memos" that "only recently c[a]me to light" about how the government mislead the courts in justifying the military orders requiring a nighttime curfew for Americans citizens of Japanese ancestry); <u>Aghamalian v. United States</u>, 781 Fed. App'x 576, 578 (9th Cir. 2019) (unclear until later events that advice was mistaken).[5]

---

[5] The Ninth Circuit and other courts have repeatedly held that lengthy delays bar coram nobis relief. <u>See, e.g.</u>, <u>Kroytor</u>, 977 F.3d at 963 (two years); <u>United States v. Njai</u>, 312 Fed. App'x 953, 954 (9th Cir. 2009) (four years); <u>United States v. Reyes</u>, No. CR 06-0463-JCC, 2021 WL 197151, at *2 (W.D. Wash. Jan. 20, 2021) ("an eighteen-month delay requires explanation"); <u>Sittman v. United States</u>, No. CR 91-00921-ACK, 2020 WL 109784, *5 (D. Haw. Jan. 8, 2020) (three years, and citing cases); <u>United States v. Indelicato</u>, No. CR-85-0078-EMC, 2015 WL 5138565, *3 (N.D. Cal. Sept. 1, 2015) (defendant's claim that "he was under the mistaken impression that there was nothing more that he could do to attack his conviction" is "not a valid excuse for waiting more than two decades to file for coram nobis relief"), <u>aff'd</u>, 677 Fed. App'x 428 (9th Cir. 2017).

In an effort to salvage his claim, defendant tries to justify his delay with two excuses. <u>First</u>, he says he only learned in February 2023 that his felony conviction would conclusively bar naturalization. Deft Decl. ¶ 13; Tolchin Decl. ¶ 16. According to defendant's Petition, it was only then that he "realized definitely" that he could not be naturalized or obtain the license necessary to become a commercial pilot. Petition at 21. But case law makes clear that timeliness is measured from when a defendant could "reasonably raise a claim" and when he "was aware of a potential ground for relief." <u>Kroytor</u>, 977 F.3d at 961; <u>see Gonzalez</u>, 981 F.3d at 852-54; <u>Martinez</u>, 90 F. Supp. 2d at 1076; <u>Golshani</u>, No. 00-cr-7-GAF, Dkt. 117 at 2. Like the defendant in <u>Maghe</u>, defendant knew almost immediately after his conviction that he was facing collateral consequences that undermined the purported misadvice from his lawyer. 710 F.2d at 503-04. By seeking an immigration waiver, defendant even took <u>other</u> affirmative steps to escape the effects of misadvice rather than filing a habeas or coram nobis claim. Defendant did precisely what the law does not permit: he tried to "postpone seeking relief until it appears that a collateral consequence is imminent." <u>Ragbir</u>, 950 F.3d at 63.

<u>Second</u>, to justify his delay, defendant alleges that his mother's illness, divorce, and the COVID-19 pandemic prevented him from hiring a lawyer and bringing his claim. Deft Decl. ¶¶ 10-11; <u>see also</u> Petition at 20-21. However, the circumstances he cites are common; to the extent they justify any delay at all, they certainly do not justify a 17-year delay from the defendant's sentence and a 10-year delay from when he certainly knew about adverse immigration consequences. <u>See, e.g.</u>, <u>Martinez v. United States</u>, 17 F. App'x 517,

519 (9th Cir. 2001) ("While Martinez did experience a number of medical ailments, we find none of the ailments prevented him from contesting his conviction at an earlier time.").[6]

* * *

The timeliness requirement is no mere technicality. Rather, it represents an important substantive requirement to access the extraordinary writ of error coram nobis. See Kwan, 407 F.3d at 1012; see also Maghe, 710 F.2d at 503-04. The facts in this case highlight why timeliness is so important: Because of defendant's delay, the transcript from his plea hearing – a critical event designed to prevent involuntary guilty pleas, and later test claims of involuntariness if raised – is lost to time. Likewise, the transcript from his sentencing proceeding, where immigration consequences might have been raised as a mitigating circumstance to justify his non-custodial sentence, is also lost. The target of his ineffective assistance of counsel claim, defense counsel, cannot defend himself from the allegation that he was constitutionally defective or provide the Court with relevant testimony and records. Allowing defendant to obtain relief on this threadbare record would encourage others to engage in gamesmanship and would threaten the finality of convictions. See, e.g., Garcia, 2017 WL 3669542, at *4 n.1 (denying

---

[6] To justify his delay, defendant cites to United States v. Hakim, No. 21-55617, 2022 WL 4103629 (9th Cir. 2001), where the Ninth Circuit quoted language from Kroytor that "specific circumstances" may justify a defendant's delay in pursuing a coram nobis claim. Id. at *1; Petition at 20-21. Yet, even in Hakim, the Ninth Circuit found that the defendant did not timely pursue his claim where the defendant learned about immigration consequences when he reported to federal prison, spent a short period in immigration custody, and then "had another thirteen years to seek legal counsel to challenge his guilty plea." 2022 WL 4103629 at *1. The Ninth Circuit found that "[h]is failure to act does not justify the delay." Id.

coram nobis petition and noting that defendant's delay resulted in the unavailability of the plea transcript); United States v. Zhu, No. 03-cr-348-WHA, 2016 WL 729525, at *2 (N.D. Cal. Feb. 24, 2016) (same and noting that, had the defendant "filed the instant petition when his immigration problems began in 2013, a transcript of his plea hearing would have been available").

Because defendant does not show "sound reasons" for his substantial delay, the Petition should be denied.

### C.   Defendant's Claim Is Barred By Laches

Apart from the four requirements that the defendant must satisfy for his coram nobis claim, defendant's claim is also barred by the doctrine of laches.

As the Ninth Circuit has explained, "[a] district court is free at any time to apply laches to a coram nobis petition, if the petitioner inexcusably delays in asserting his claims and the government is prejudiced by the delay." Telink, Inc. v. United States, 24 F.3d 42, 45 (9th Cir. 1994) (citation omitted). Under the doctrine of laches, the Government "first must make a prima facie showing of prejudice." Riedl, 496 F.3d at 1008 (quoting Telink, 24 F.3d at 47). If the Government meets its burden, then "the burden of production of evidence then shifts to the petitioner[] to show either that the government actually was not prejudiced or that the petitioner exercised reasonable diligence in filing the claim." Id. (quoting Telink, 24 F.3d at 47). Laches is a defense separate from the four standard requirements for a coram nobis claim. Id.; see also United States v. Indelicato, No. CR-85-0078-EMC, 2015 WL 5138565, *5-6 (N.D. Cal. Sept. 1, 2015) (holding that doctrine of laches barred coram nobis petition).

The government may satisfy its burden of showing prejudice where the defendant's delay means that "the record no longer permits the government to effectively rebut [his coram nobis] claims." Rodriguez-Lugo v. United States, 458 F. App'x 688, 689 (9th Cir. 2011). (affirming district court dismissal of petition on the basis of laches); see also Telink, 24 F.3d at 48. For example, in United States v. Darnell, 716 F.2d 479 (7th Cir. 1983), the Seventh Circuit affirmed the use of the doctrine of laches to bar coram nobis relief where a defendant's delay in seeking relief meant "the court reporter's notes have been lost or destroyed, thus eliminating any exact record of what transpired," which "prejudiced the government in its ability to establish the voluntariness of the" plea. Id. at 481.

Here, defendant's delay has prejudiced the government in responding to his coram nobis petition and, if required, prosecuting him at trial. In responding to coram nobis petition, defendant's delay has resulted in the loss of his plea transcript and sentencing transcript. See Darnell, 716 F.2d at 481. His defense attorney can no longer provide relevant documents or testimony. Were defendant allowed to successfully withdraw his plea, the government would also be severely prejudiced in its ability to prosecute the defendant at trial. Witness memories have no doubt eroded, evidence has not been maintained, and it may be nearly impossible to find the victims whose credit card information defendant stole. The Assistant United States Attorneys who charged and prosecuted defendant in 2005 and 2006 have since left the Department of Justice. Bhatia Decl. ¶ 6.

Because the government has shown prejudice, the burden of production "shifts to the petitioner[] to show either that the government actually was not prejudiced or that the petitioner

exercised reasonable diligence in filing the claim." Riedl, 496 F.3d at 1008 (quoting Telink, 24 F.3d at 47). Defendant cannot satisfy his burden of showing reasonable diligence in filing his claim. See supra, Part IV.B. Accordingly, under the doctrine of laches, defendant's claim also fails.

### D.   Defendant Is Not Entitled To An Evidentiary Hearing

Because defendant has not adequately alleged facts to establish his claim beyond mere conclusory statements, he is not entitled to an evidentiary hearing. "If a defendant could throw into doubt the validity of a prior conviction by merely filing a self-serving document alleging that" the conviction "was unconstitutionally obtained, then the burden would" effectively "be the government's to establish the validity of all prior . . . convictions." Cuppett v. Duckworth, 8 F.3d 1132, 1139-40 (7th Cir. 1993). "This might very well create judicial chaos." Id. at 1140.

Courts have declined to hold evidentiary hearings for post-conviction proceedings where a defendant's petition does not "substantiate" his ineffective assistance claim and a hearing would provide nothing further. See, e.g., Shah v. United States, 878 F.2d 1156, 1158 (9th Cir. 1989) (holding that hearing was not required on habeas petition where allegations, when viewed against the record, do not state a claim for relief or are so palpably incredible or patently frivolous as to warrant summary dismissal); Garcia, 2017 WL 3669542, at *4 n.1 ("Defendant cannot substantiate his broad allegations that [counsel] did not inform him of the immigration consequences and that he would not have pled guilty to the section 1029(b) offense or would have gone to trial, and he also does not suggest that his testimony or evidence at a potential hearing would

depart from his declaration."). Courts have also declined to hold evidentiary hearings where a petition does not show that he timely brought his coram nobis claim. See Indelicato, 2015 WL 5138565, at *5 ("The Court further denies Indelicato's request for an evidentiary hearing because the record is clear that Indelicato sat on his rights between 1987 and 2012, and Indelicato has not suggested that he would testify differently (i.e., contrary to his prior declaration) at any such hearing.").

Here, the Court should deny the Petition without holding an evidentiary hearing. Defendant's ineffective assistance claim is supported only by his non-specific allegation that he was misadvised. Given defendant's failure to corroborate his declaration, his statements alone are owed little weight. See Garcia, 2017 WL 3669542, at *4 ("The Court has little else to assure itself that [d]efendant's self-serving declaration is credible."); Zhu, 2016 WL 729525, at *2 (holding that "[the defendant]'s declaration, on its own, is insufficient" and noting that it should view "petitioners' self-serving declarations with skepticism."). In the face of this years-late, self-serving allegation, the evidence strongly suggests that defendant knew that his felony criminal conviction would at least pose a hurdle to naturalization. See supra, Part IV.A.1. The statements in his declaration are insufficient to support this claim, and there is no reason to believe an evidentiary hearing will add more support. See Garcia, 2017 WL 3669542, at *4.

Even if the Court finds that an evidentiary hearing would be warranted on the narrow fact of whether defendant was misadvised, the Court should still deny Petition and an evidentiary hearing because defendant has not shown prejudice or that he timely brought his

30

claim. An evidentiary hearing would add little to the facts about prejudice or timeliness. <u>Indelicato</u>, 2015 WL 5138565, at *5.

**V.    CONCLUSION**

    For the foregoing reasons, the government respectfully requests that this Court deny the Petition.